## Case No. 3,566.

### In re DANIELS.

[6 Biss. 405:[1] 13 N. B. R. 46; 1 N. Y. Wkly. Dig. 271; 8 Chi. Leg. News, 17.]

District Court, N. D. Illinois. July Term, 1875.

BANKRUPTCY—STOCK BROKER'S CLAIMS—LOSS ON STOCK SOLD WITHOUT LEAVE OF COURT.

1. Brokers carrying stocks on a margin, which at the time of the commencement of bankruptcy proceedings could have been sold out at a profit, but who carry it until a decline, and finally close it out at a loss, all without application to the court, cannot prove their claim for differences against the estate.

2. A broker who holds stocks on a margin is bound to take notice of the buyer's bankruptcy.

3. If a broker, who holds stocks on a margin, continues to hold them for an unreasonable length of time after the buyer's bankruptcy, and then sells them without notice, he must sustain the loss.

In bankruptcy. This was an application on the part of the assignee of said bankrupt [John H. Daniels] to expunge a claim filed for between fourteen and fifteen thousand dollars, by the firm of F. B. Wallace & Co., of New York City.

Hutchinson & Luff, for creditors.

John Van Arman, for assignee.

BLODGETT, District Judge. It appears from the evidence in the case, that Daniels was for some years prior to his being declared bankrupt, a banker at Wilmington, in Will county, in this district; that F. B. Wallace & Co., the claimants, were engaged in the business of stock brokers in the city of New York; that Daniels filed his voluntary petition in bankruptcy on the 3d day of July, 1873, upon which he was immediately adjudged bankrupt; that for two or three

years prior to his bankruptcy, Daniels had been operating to a greater or less extent in stocks upon the New York market, through the firm of F. B. Wallace & Co., who purchased stocks upon the orders of Daniels, paying the money therefor and receiving and holding the stocks together with a margin of ten per cent., or less, as security for the money advanced by them.

At the time Daniels was declared bankrupt, Wallace & Co. held seven hundred and fifty shares of the stock of the Chicago & Alton Railroad Company, which had been purchased pursuant to the arrangement I have mentioned, upon which, however, the margin was nearly exhausted, but the stock at that time could have been sold so as to have left some balance to the credit of Daniels in the hands of the brokers. After Daniels' adjudication, and until about the 18th of September, 1873, said stock remained at about the same price. After the 18th of September—being about the time that Jay Cooke & Co. failed—said stock declined rapidly in value, and on the 24th of October, Wallace & Co. sold the same, and passed the proceeds to the credit of Daniels, leaving Daniels, by their account rendered, in debt to said brokers in the sum of thirteen thousand four hundred dollars. This amount, together with the interest accrued thereon, said Wallace & Co. have brought as a claim against the estate of Daniels, and the assignee seeks to have the same expunged on the ground that it is not a valid claim to be paid out of the assets of said estate.

It will be noticed from the recital of facts, that at the time Daniels became bankrupt, the adventure in these stocks could have been closed so as to have left something to the credit of the bankrupt; in other words, the bankrupt did not owe his brokers anything at that time. True, it is claimed on the part of the brokers that this transaction was in all respects that of a loan from Wallace to Daniels of the amount of money necessary to buy the stocks in question, and that they simply held the stocks as security for their loan, but it is equally apparent from the evidence and from the nature of the transaction as developed by the proof, that Daniels was engaged merely in speculating upon the fluctuations in the value of this stock. He never intended to become the owner of this stock upon the books of the corporation by whom it was issued, but simply bought the stocks upon a margin which he had put up with his brokers for the purpose of making a profit, if any should accrue, in an advance on the price of said stocks. The real owners of said stocks were the brokers who had advanced the money to buy the same and held the stocks in their own name for their own security, together with whatever margin Daniels might have from time to time remaining in their hands.

It does not appear that any application was made by Wallace & Co. to this court for

[1] [Reported by Josiah H. Bissell, Esq., and here reprinted by permission.]

leave to sell these stocks, nor did the assignee of the bankrupt, who was elected on the 18th of August, receive any notice from Wallace & Co. of any such intention, but the brokers held such stocks probably as long as under the circumstances they thought it profitable or safe to themselves to hold them, and then, without notice, sold them upon the market for whatever price they would bring.

The bankrupt in his schedule refers to these stocks as held on a margin, and in which he had no interest except for a disputed difference between himself and his brokers in regard to the interest which had been charged him. As I said before, there was no indebtedness between the broker and the bankrupt at the time Daniels became bankrupt.

It was undoubtedly the duty of Wallace & Co., under the circumstances, to take notice of Daniels' adjudication in bankruptcy. They were bound to know that their correspondent had lost the ability to control this venture from the time of his adjudication, and that the management of the affair was thereafter in the hands of this court; and as it is no part of the duty of an assignee in bankruptcy to speculate in stocks, there can be no doubt but what this court, on information being imparted to it of the condition of the bankrupt's estate with reference to these dealings with Wallace & Co., would have at once ordered said stocks sold and the adventure terminated; but without disclosing the relations which they bore to the court, Wallace & Co. continue to hold these stocks upon a declining market, through a critical financial period, and finally sell them out without leave of court, and seek now to make the bankrupt's estate responsible for this large difference.

I do not think the claim, as it is presented under the evidence, should be allowed. It has all accrued since Daniels was adjudged bankrupt, and under such circumstances that I cannot conceive that the creditors or assignee of Daniels are morally or legally bound to sustain this loss.

The claim is therefore expunged.

Generally as to the rights of creditors holding securities or collaterals, consult Bump, Bankr. § 5075, and notes under said section.